**William Joseph HEALY, Jr., Appellant,**

v.

**NEW YORK LIFE INSURANCE COMPANY, Appellee.**

No. 87–5484.

United States Court of Appeals,
Third Circuit.

Argued Jan. 11, 1988.

Decided Nov. 7, 1988.

Arnold S. Cohen (argued), Reba Carmel, Oxfeld, Cohen, Blunda, Friedman, LeVine & Brooks, Newark, N.J., for appellant.

Peter M. Panken (argued), Joseph C. Galardi, Parker Chapin Flattau & Klimpl, New York City, Carl Rifino, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., for appellee.

Before HIGGINBOTHAM and BECKER, Circuit Judges, and SHAPIRO, District Judge *.

* Honorable Norma L. Shapiro, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal from a grant of summary judgment for the employer in an action brought under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1982). The case was brought by William Healy, a former Vice President of New York Life Insurance Company ("the Company"), following his discharge as part of a company-wide reduction in force ("RIF"), which consolidated high-level management positions in response to competitive pressures. It is clear from the record that Healy established a prima facie case. It is also clear that the Company articulated legitimate business reasons for assigning Healy's duties to a somewhat younger man who, the company claims, had demonstrated greater ability than Healy to assume high level managerial responsibility.

The difficult issue in the case is whether Healy demonstrated that a genuine issue of material fact existed concerning the Company's asserted non-discriminatory reasons for Healy's discharge. More specifically, we must determine whether the district court correctly decided that the legitimate business reasons articulated by the Company did not serve as a pretext to mask age discrimination. Our review is plenary. The question is a close one. However, we conclude that Healy did not meet his evidentiary burden of demonstrating a genuine issue of material fact as to pretext. We therefore will affirm the district court's grant of summary judgment in favor of the Company.

I.

Healy was fifty-six years old when the Company discharged him after twenty-five years of service. His tenure with the Company began in 1963 when he was hired as an agent. Healy was promoted several times, eventually becoming a Vice President of the Company's Marketing Department in 1979, responsible, *inter alia*, for

the Company's internal communications. Because his performance with the Company after 1979 forms the factual matrix for the summary judgment ruling, we recite in some detail the relevant facts of record, developed through depositions, affidavits, and company documents (particularly performance evaluations).

At the time of Healy's 1979 promotion, the Marketing Department was composed of two divisions, agent training and management training. The agent training division taught agents to sell the Company's insurance and financial products. To be successful, sales agents had to learn consumer psychology and technical matters such as the tax advantages of various products. Managers recruited and motivated the agents. The training of managers focused on personnel development, planning and organizing skills, managing expenses and achieving profitability, and the recruiting of new agents.

Prior to the reduction in force, several management levels supervised agent and management training. These levels included Assistants and Associates who reported to Managers, Managers who reported to Assistant Vice Presidents, and Assistant Vice Presidents who reported to the Vice President in charge of the division. During Healy's tenure as Management Vice President in charge of the Management Training division, another Vice–President, Ed Hesse, was responsible for agent training. Marketing Vice President Walter Ubl supervised both positions, and he, in turn, reported directly to the head of the Marketing Department, Senior Vice President Jerald Hinrichs.

This rough organizational scheme demonstrates that the Vice Presidents for both the agent and management training jobs were high-level executive positions possessing substantial management authority. Successful performance in these jobs required a resourceful executive willing to take initiative and to assume responsibility. At the time of his discharge, Healy managed a budget of close to $2,000,000 and directly supervised three Assistant Vice Presidents who were responsible for other Managers and Associates.

During the years immediately following his 1979 promotion, Healy received generally favorable evaluations. However, these evaluations also evidenced deficiencies in high-level executive performance. In a November, 1983, evaluation, Healy's immediate supervisor, Vice President Walter Ubl, reported that Healy "is a very experienced and valuable employee.... His extensive background with the company has enabled him to apply creative approaches to new challenges." App. at 50. But this same evaluation also noted that Healy became "so involved in [one] program that other ongoing programs cause him concern." Nevertheless, Healy received the highest rating possible in this 1983 evaluation and subsequently was promoted to Marketing Vice President in charge of management training in June, 1984.

Although Healy earned favorable reviews in this new position, his evaluations revealed significant shortcomings. In a March, 1985, review, Healy's immediate superior (who is no longer with the Company) wrote that Healy "demonstrates significant people and team-building skills. He takes direction and guidance easily and quickly.... He utilizes good judgment in addressing his responsibilities." *Id.* at 65. But like the earlier evaluation, the reviewer echoed the concern that Healy "must delegate more of the work-load and spend more time in staff development." *Id.*

In August, 1985, Healy was assigned responsibility for preparing the Management by Objectives ("MBO") report for the entire Marketing Department. MBO is a management theory which posits that managers will be more effective if they can analyze what they must accomplish and develop measurable standards to determine if the desired objectives have been obtained in key result areas. The MBO was outside Healy's normal manager training duties and required him to focus on the work performed by the Marketing Department as a whole.

Since the MBO project implicated the interests of the entire Marketing Depart-

ment, Healy worked closely with his superiors, Hinrichs and Ubl. The affidavits of both Hinrichs and Ubl represent that Healy's coordination of the MBO program was unsatisfactory, and that his performance lacked creativity and initiative. According to the affiants, rather than exercising the insight and innovation that the project required, Healy merely collated and collected information from others. Hinrichs and Ubl state that Healy's poor performance created delays and resulted in additional work for both of them.

Reacting to this criticism, Healy testified that he thought that his function in the MBO project was to incorporate the same measurements that had been used previously, assemble the raw data, and pass the information on to his superiors rather than analyze the results himself. Healy further claimed that the MBO report was not assigned exclusively to him, that he never was informed that his performance was unsatisfactory, and that, in any case, he spent less than 10 percent of his time preparing the report.

Four months later, in December of 1985, the Company decided to reduce the total salary expenses of management personnel by 20 percent to remain competitive in an increasingly demanding business environment. As a result, the Company offered employees who were 55 years or older attractive early retirement packages. Departments that had not reduced managerial staff by 20 percent faced involuntary terminations. The Marketing Department was unable to reduce its total salaries by the requisite 20 percent, despite the early retirement of Ed Hesse, the Vice President in charge of agent training.

On February 25, 1986, Hinrichs informed Healy that he was being discharged. The Company also discharged seven other members of the Marketing Department at the same time. Hinrichs represented that Healy was discharged because he

> could neither effectively supervise a combined [manager and agent] training division nor effectively handle the substantial increase in responsibility that would have been required had he been retained.

I found that the plaintiff, rather than taking it upon himself to broaden his responsibilities, would instead try to narrow the scope of his functions. He appeared reluctant to assume expanded responsibilities and encountered problems when faced with coordinating a substantial number of on-going programs. Moreover, he was not good at identifying important future problems or objectives and deciding how to meet them. He also tended to focus only on his own area of responsibility.

*Id.* at 141–42. Hinrichs further states that his decision also reflected Healy's inadequate performance on the MBO program.

Following Healy's discharge and the voluntary retirement of the Vice President for agent training, Hinrichs initially decided to reallocate the responsibilities of these two positions among the Assistant Vice Presidents. He decided to leave the Vice President positions vacant and to determine later whether to create a consolidated position, combining the functions of both jobs. Most of Healy's responsibilities were assumed by Paul Russell, age 47, with the exception of the MBO program, which was assigned to another Vice President, Richard Carter, age 55. At the time of Healy's discharge, Russell had been with the company 22 years, most recently serving as one of Healy's three Assistant Vice Presidents.

Hinrichs and Ubl both testified that Russell's performance during the period following Healy's departure was superior to Healy's prior performance. As a result, in July, 1986, Hinrichs reorganized the Marketing Department, combining the responsibilities of the Vice Presidents in charge of agent training and management training into one position under Russell's direction. This combined position involved more responsibility than the job from which Healy had been discharged and required someone with a broad perspective on the operations of the Marketing Department, willing to assume responsibility for both agent and management training in the post-RIF business environment. Indeed, Russell was ultimately responsible for a budget of 4.7

million dollars—over twice as much as Healy's at the time of his discharge. In justifying this promotion, Ubl contends that Russell

> was an excellent manager with the capability of assuming greatly expanded responsibilities. Mr. Russell had conceived, designed and executed numerous valuable programs and initiatives and was the type of manager who would enlarge his job to ensure that it was done as effectively as possible, and was well able to handle the additional responsibility.

*Id.* at 167.

On July 9, 1986, Healy filed an age discrimination charge with the Equal Employment Opportunity Commission. On August 4, 1986, the Company completed Healy's final evaluation. This evaluation reemphasized Healy's limitations in assuming responsibility outside the formal boundaries of his job description. The evaluation rated him a 3 on a scale of 1 to 5 (1 is the highest), as opposed to the 1 Healy had earned in his 1983 review and the 2 he had received in 1985. Although the evaluation mentioned Healy's broad experience and his communication skills, it also found that Healy "too zealously guards his 'turf' to the extent subordinates feel little opportunity to expand areas of responsibility." *Id.* at 82. Furthermore, the review stated that Healy lacked an "acquisitive view of what needs to be done as part of his job." The report noted that Healy "needs to delegate more—take a bigger view of his job. Must be more future oriented—focuses on the here and now." *Id.* at 82.

On October 21, 1986, Healy brought suit in the district court for the District of New Jersey, alleging that his discharge violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1982). Healy's complaint sought damages for lost income and benefits, reinstatement and restoration of benefits, liquidated damages, costs, and attorneys' fees. Upon the completion of discovery, the Company moved for summary judgment on the ground that Healy had failed to raise a genuine issue of material fact supporting his contention that his termination resulted from age discrimination.

In its summary judgment papers, the Company proffered statistical evidence to support its position that it did not use the RIF as a vehicle for age discrimination. The evidence showed that the Company-wide percentage of employees over the age of forty remained essentially the same as a result of the RIF. Similar results occurred in the Marketing Department. Of the thirty-four Marketing Department employees who were fifty years or older at the time of the RIF, Healy was the only one fired. The statistics are set forth in more detail, *infra* at 1218. The data did not, however, include the employees who elected early retirement.

Analyzing the record in response to the Company's motion for summary judgment, the district court first found that "[t]he Company has presented substantial evidence to support its claim Healy was not discharged because of his age." *Id.* at 195. The court identified legitimate business reasons supporting the Company's decision, including a company-wide RIF which increased the percentage of employees in the protected age group, specific shortcomings in Healy's performance, and the Company's judgment that another executive (Russell) "was more highly qualified to handle the post-reduction consolidated responsibilities." *Id.* at 196. The court then concluded that Healy had "submitted no specific facts either to affirmatively support the allegations contained in his complaint or to rebut or undermine the evidence presented by the Company." *Id.* at 198. It therefore granted the motion for summary judgment. This appeal followed.

## II.

### A.

The requisites for proof of age discrimination and the standards governing the grant of summary judgment in ADEA cases have been explained in numerous opinions. *See Chipollini v. Spencer Gifts Inc.,* 814 F.2d 893 (3d Cir.) (in banc), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 26, 97

L.Ed.2d 815 (1987); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *see also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–57, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (analogous standard for gender discrimination). We need not restate those standards here, though we shall, of course, apply them in our discussion. Before analyzing the facts of record in light of these standards, we make two preliminary comments.

■ First, Healy sought to satisfy his required burden of proof of intentional discrimination by the use of indirect rather than direct evidence, as the law permits. Second, we are satisfied that Healy established a prima facie case, since he showed that: (1) at age fifty-six he was a member of a protected class; (2) he was qualified for the position from which he was discharged; (3) he was discharged despite his qualifications; and (4) the position was filled by a person sufficiently younger to permit an inference of age discrimination.[1]

■ Given the facts set forth above about the demands of high-level management positions and the deficiencies in Healy's performance, the Company proffered a legitimate business reason for discharging Healy. We turn therefore to an analysis: (1) of the Company's legitimate business reasons for the discharge; and (2) of Healy's claim of pretext with a view to determining whether Healy has raised a genuine issue of material fact. To facilitate this analysis, we review the evidence in four separate sections. First, we look at Healy's qualifications as represented by his evaluations and by his performance on the MBO. Next, we turn to Russell's performance. Then we examine the statistical evidence presented by the Company. Finally, in terms of the legal standard, we examine the record to see if Healy has presented specific evidence that *"could* support an inference that the employer did not act for non-discriminatory reasons." *Chipollini,* 814 F.2d at 900.

We note preliminarily that each ADEA case must be judged on its own facts. The legitimacy of the employer's proffered business justification will be affected both by the duties and responsibilities of the employee's position and the nature of the justification. Concomitantly, the significance of variations among an individual's personnel evaluations may well depend upon the nature of the employee's responsibilities; a more exacting standard of performance may have to be applied to positions of greater responsibility.

### B.

Both Ubl and Hinrichs submitted affidavits identifying specific weaknesses in Healy's performance. These affidavits stated that Healy did not delegate enough, that his focus was too narrow, and that he did not readily assume new responsibilities out-

---

1. The Company asserts that to establish a prima facie case in the context of a RIF this fourth criterion requires Healy to prove that after his discharge a *less* qualified employee was retained in the *same* position. We disagree. To establish a prima facie case, Healy does not have to demonstrate that he was more qualified than the person who took the same job; it is sufficient to show that he was discharged, while the Company retained someone younger. *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 n. 2 (3d Cir.) ("Duffy would ... have established a prima facie case, by proof that he was discharged while ... a younger employee was retained."), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.) (The "prima facie case is easily made out: A plaintiff alleging a discriminatory layoff need show only that he is a member of a protected

class, and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably."), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

Surveying our jurisprudence, we observe that because the prima facie case is easily made out, the prima facie case is rarely the focus of the ultimate disagreement. Rather, "the exigencies of a reduction-in-force can best be analyzed at the stage where the employer puts on evidence of a non-discriminatory reason for the [discharge]." *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339, 343 (D.C.Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). Generally, the focus of age discrimination cases centers the defendant's articulated legitimate business reasons and the plaintiff's evidence of pretext.

side the formal boundaries of his job description. As Ubl states in his affidavit:

I found that the plaintiff lacked an acquisitive view of his job, and rather than taking it upon himself to broaden his responsibilities, would instead try to narrow the scope of his functions. I found that the plaintiff was reluctant to assume expanded responsibilities, and that he encountered problems when faced with coordinating a substantial number of ongoing programs. Plaintiff tended to focus only on his own area of responsibility, and even in that role, he had substantial difficulty in effectively delegating work to lower-level employees. Instead, he would become enmeshed in details himself, while losing sight of the broader picture. In addition, the plaintiff was not good at identifying important future problems or objectives or deciding how to meet them.... I determined that he did not possess the management abilities that would render him capable of adequately handling the substantial increase in responsibilities that would be required following the reduction or of effectively managing a combined ... division.

App. at 165–67; *see also* Hinrichs Affidavits, *supra* at 1212. These allegations also were supported by Healy's performance reviews in 1983 and 1985 and by his post-termination evaluation. *See supra* at 1211–1212. Nevertheless, Healy makes three arguments that these identified weaknesses were pretextual.

First, Healy argues that the same evaluations cited by the Company as evidence of his unwillingness to take the initiative also contain portions that showed that he assumed new responsibilities. However, this fact does not refute the Company's legitimate business reasons for his discharge, even when read in the light most favorable to Healy. These 1983 and 1985 evaluations referred to jobs that demanded less responsibility and initiative than the consolidated position eventually filled by Russell. Good (or even excellent) performance in a lower level position does not necessarily imply success in a more competitive environment. Furthermore, although often complimenta-

ry, the reviews did note that Healy had problems delegating authority and managing multiple projects—factors clearly relevant to the demanding managerial job that Russell eventually filled.

Second, Healy points out that the Company promoted him immediately following the very 1983 evaluation which it uses to demonstrate his shortcomings as a manager. However, a promotion from a lower level job, despite identified weaknesses, does not suggest that the weaknesses do not exist or that they would not be important in evaluating performance in a more demanding job.

■ Finally, Healy notes that his 1986 post-termination evaluation is dated August 4, three weeks after he filed a charge of age discrimination with the EEOC. We recognize that in *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108 (3d Cir.1988), *petition for cert. filed,* 56 U.S.L.W. 3834 (U.S. May 25, 1988), this court found that a highly unfavorable performance evaluation prepared after an employee expressed his view that he might have been passed over for a promotion because of race discrimination provided evidence of pretext. In the case *sub judice,* however, Healy's post-termination evaluation was not substantially different from his previous ones. Although Healy descended one notch in the numerical ratings, the 1986 evaluation cited performance problems that had been apparent in previous reviews. Healy submitted no evidence indicating that this review was aberrational or in any way pretextual. Thus, Healy has not demonstrated that the identification by the Company of shortcomings in his performance in his 1983, 1985, and 1986 evaluations were pretextual.

*Post hoc* explanations, like any self-helpful statement made after the initiation of a lawsuit, may be to some degree suspect. However, the mere fact that a defendant relies on a *post hoc* evaluation does not in and of itself create a factual dispute about whether the evaluation is pretextual. To the extent that the dissent argues that a *post hoc* justification *ipso facto* creates a pretext, it is plainly wrong. Unless the

plaintiff introduces counter-affidavits and argumentation that demonstrate that there is reason to disbelieve this particular explanation, there is no genuine issue of material fact. *See* C. Wright, A. Miller & M. Kane, 10A *Federal Practice and Procedure* § 2726, at 118–19 (1983) ("[T]he general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment.").

### C.

The Company relies heavily upon Healy's unsatisfactory efforts in coordinating the MBO. As we have noted, the MBO involved the development of measurable standards to determine if corporate objectives have been met in key result areas. The task of preparing the Marketing Department's MBO, assigned by Hinrichs to Healy, required careful analysis to ensure that meaningful information was incorporated into the standards. Hinrichs and Ubl expected Healy to assume broad responsibility, adopting the perspective of the Marketing Department as a whole. In contrast, Healy narrowed his focus on the MBO, concentrating on merely collecting and collating data. Rather than sorting through the data analytically and challenging inappropriate information, he shifted the responsibility to his superiors.

Healy's deposition testimony itself suggests he had a limited view of his role:

Q. ... [T]hey would give you the figures and you would just plug them in?

A. Yes.

Q. You had nothing to do with these figures other than the mechanical?

A. That's true. That was not my job to originate these figures. It was to coordinate and to finalize them on this form.

Q. When you say finalize, do you mean anything other than taking them and putting them on the form?

A. Putting them on the form and then passing it [to Ubl and Hinrichs] for their approval.

. . . . .

Q. Does [Healy] say, this looks right to me, this doesn't look right to me or does

he say, thank you very much, I'm going to put them on the form?

A. My job was to obtain the figures, not to discuss them as to the suitability of the figures.

App. at 126–27.

In response to the Company's allegations that his performance was unsatisfactory (in light of the expectations of Hinrichs and Ubl), Healy responds that he was never warned that he was doing a bad job. Although we can sympathize with Healy's situation and observe that employees will perform better if they receive feedback, we note that from a legal perspective managers are not compelled to convey their dissatisfaction to employees. *See Pierce v. New Process Co.*, 580 F.Supp. 1543, 1545 (W.D.Pa.), ("[T]he company is under no obligation to warn plaintiff of complaints regarding his performance and, if anything, the effect of such evidence is equivocal, perhaps indicating that plaintiff was receiving the benefit of the doubt."), *aff'd mem.*, 749 F.2d 27 (3d Cir.1984).

Healy also argues that he spent less than 10 percent of his time on the MBO. Ten percent of an executive's time, however, can be substantial, particularly if spent on projects the company values. In any case, our inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee. *See Thornbrough v. Columbus and Greenville Railroad Co.*, 760 F.2d 633, 647 (5th Cir.1985) ("The ADEA was not intended to be a vehicle for judicial second-guessing of business decisions, nor was it intended to transform the courts into personnel managers."). Moreover, the significance of the evidence about the MBO does not lie in the amount of time Healy chose to spend on the project or his own judgment about its importance, but on what his performance indicates about his ability to meet employment challenges.

We conclude that Healy did not provide enough evidence with respect to the Company's MBO evaluation to give rise to an inference that the Company's proffered business justification is pretextual.

**D.**

The Company presented evidence that Russell's managerial ability was highly regarded. Hinrichs, in his affidavit, avers that:

> Russell ... performed his own work and that of the Marketing Vice President as well, and did the combined job better than [Healy] had done his [own smaller job].... Mr. Russell's promotion ... was in recognition of his consistently superior performance and the high level of management ability he had displayed over a long period of time. Mr. Russell had shown himself to be creative, innovative and willing to take the initiative to broaden the scope of his responsibilities. Moreover, Mr. Russell had had recent, extensive experience in agent training. During his nearly 20 years in Company field offices, he had worked in several positions where he was responsible for agent training.

App. at 143–44; *see also* Ubl's Affidavit, *supra* at 1213. Even Healy in his deposition and written evaluation speaks well of Russell:

> Q. What was your judgment of Russell's effort?
>
> A. Excellent. I was very proud of him.

App. at 108. Similarly, Healy's evaluation of Russell noted that Russell shows "significant initiative" and "self starting abilities." *Id.* at 74.

The record reflects that Russell demonstrated a willingness to assume new responsibilities and that he was flexible and able to delegate. Throughout his tenure in the training division, Russell conceived, designed, and executed numerous programs and initiatives. He also increased his effectiveness. These are the very traits that Hinrichs and Ubl felt Healy lacked. The Company thus credibly argues that the decision to promote Russell was based on his creativity and superior management ability.

Healy notes that he had a higher evaluation than Russell in at least one category. Healy's performance was rated "effective" (the middle category of three) or as a "notable strength" (the highest category) in every relevant category in a March, 1985,

evaluation; in contrast, Russell was found to "need improvement" in his written communication in a similar April, 1985, evaluation. Nevertheless, nothing in the record suggests that, compared with other managerial skills, writing was such an important part of the combined job to which Russell acceded. Moreover, Healy did not point to any other weaknesses in Russell's performance. We thus find insufficient evidence of pretext to permit a reasonable fact finder to infer discrimination in the Company's selection of Russell over Healy.

**E.**

■ The Company submitted, along with its affidavits, statistical evidence suggesting that the RIF did not have a disproportionate impact on older workers. We have approved the use of statistical evidence to support a plaintiff's claim of disparate treatment. In *Green v. USX Corp.*, 843 F.2d 1511 (3d Cir.1988), the plaintiffs alleged that USX's overall system of hiring was discriminatory, but they did not challenge specific procedures or decisions. We held that statistical evidence showing that, in the aggregate, equally qualified blacks were less likely to be hired was sufficiently probative to make out a prima facie case in a disparate treatment class action suit. In *Green*, the statistical evidence supported the plaintiff. As a matter of logic, statistical evidence could also be relevant when it buttresses the claims of the defense. Additionally, the Supreme Court has explained that "a non-discriminatory 'bottom line' and an employer's good-faith efforts to achieve a non-discriminatory work force, might in some cases assist an employer in rebutting the inference that particular actions had been intentionally discriminatory." *Connecticut v. Teal*, 457 U.S. 440, 454, 102 S.Ct. 2525, 2534, 73 L.Ed.2d 130 (1982).

Nevertheless, we approach the use of statistical evidence presented by the defense in a disparate treatment case with caution. We emphasize that "statistics are not irrefutable; they come in infinite variety, and, like any other kind of evidence they may be rebutted. In short, their usefulness depends on all of the surrounding

facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

We are skeptical that use of statistics, however compelling, can in and of itself constitute a complete defense in disparate treatment cases. The Supreme Court has made clear that statistical evidence demonstrating that an employment policy, considered as a whole, is non-discriminatory does not completely insulate employers from disparate treatment suits. "A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). The very nature of disparate treatment cases focuses on the bias against an individual because of age, race or sex. Because such bias is irrational, it may not follow a consistent pattern. As the Supreme Court explained: "Congress never intended to give an employer license to discriminate against some employees ... merely because he favorably treats other members of the employees' group." *Connecticut v. Teal*, 457 U.S. at 455, 102 S.Ct. at 2535. Furthermore, statistics are often unreliable because company-wide data may mask discrimination on a smaller scale. In sum, statistical evidence can be probative if cautiously and critically applied, but it cannot end our inquiry.

According to the uncontested statistics provided by the Company, the percentage of employees at the Company over the age of forty remained the same after the RIF terminations.[2] More particularly, in the Marketing Department, the percentage of employees in the protected age group remained essentially the same following the discharges. The Company discharged eight out of the 125 Marketing Department employees who remained after the voluntary retirement plan. Before the RIF, the Marketing Department had sixty-three people forty years old or over. Of the eight terminees, four were in the protected age group. Healy was the only person over fifty. Three of the other discharged employees were between the ages of forty and forty-four. Among the ten employees at Healy's level before the RIF, Healy was the only one discharged. Of those Vice-Presidents retained, one was fifty-nine years old, three years older than Healy, and another fifty-six. In fact, six of the nine Vice-Presidents retained were age fifty or older.

We observe that these results may have been different if the older employees who accepted early retirement had been accounted for. The Company, however, provides no such statistics. Although Healy has not challenged the Company's statistical evidence, we note that the number of older workers may have been substantially reduced by the early retirement plan and that the Company's statistics concerning the pre- and post-RIF workforce may be misleading. Furthermore, because Healy claims that Hinrichs and Ubl discriminated against him personally on the basis of age, statistical evidence concerning the Company-wide discharge patterns is tangential to the behavior of the relevant decision makers.

The only relevant statistical evidence concerns the Marketing Department's discharge patterns—discharge decisions made by Hinrichs. This evidence tends to support the Company's assertion that termination decisions by Hinrichs and Ubl were not the result of age discrimination. It therefore corroborates, at least in some measure, the legitimate business reasons articulated by the Company for Healy's discharge.

### III.

█ In evaluating the evidence, Healy relies heavily on our decision in *Chipollini v. Spencer Gift Inc.*, 814 F.2d 893 (3d Cir.) (in banc), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). There, the in banc court reversed the district

---

**2.** The ADEA protects individuals "who are at least forty years of age." 29 U.S.C. § 631(a) (Supp. IV 1988).

court's grant of summary judgment, explaining:

> The proffered reason for discharge is a subjective one. The plaintiff challenges the defendant's post-litigation articulation of its intent and the documentary evidence can be viewed as supporting the plaintiff's challenge. Consequently, the issue of pretext turns on [the employer's] credibility and is not appropriate for resolution on a summary judgment motion.

*Id.* at 901. We emphasize that, despite the breadth of the language in *Chipollini*, discrimination cases are inherently fact-bound. Certainly *Chipollini* does not stand for the proposition that summary judgment is *never* available in discrimination actions. Rather, we understand the teaching of *Chipollini* to be that where plaintiffs proffer evidence of pretext and create a genuine issue of material fact as to the credibility of the employer's "legitimate" business reasons, summary judgment is foreclosed.[3]

Indeed, because the plaintiff introduced substantial evidence of pretext in *Chipollini*, it presents a good example of a case in which a court cannot grant summary judgment. In *Chipollini* the plaintiff rebutted the defendant's proffered reasons for the discharge: (1) a medical problem cited by the defendant as a reason for the discharge was shown not to affect Chipollini's job performance; (2) the plaintiff's immediate supervisors could not identify a single specific example of poor performance by him; and (3) the defendant alleged that Chipollini had inadequately performed his duties as energy warden, when in fact the company never clearly asked him to perform such duties. *Chipollini*, 814 F.2d at 900–01.

Similarly, the case at bar is distinguishable from *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 730, 98 L.Ed. 2d 679 (1988). In *Sorba*, the defendants claimed that Sorba's dismissal had been for unsatisfactory performance on his last three jobs. The defendants claimed that Sorba "padded jobs, accrued unnecessary

overtime, caused morale problems by criticizing the company and refused on occasion to take direct orders." *Id.* at 203. However, the deposition testimony of Sorba's two immediate supervisors suggested that Sorba's performance did not cause the problems associated with his last three jobs. Nor could the Supervisors claim specific problems with his performance, or identify instances where he was a detrimental influence. *Id.* at 204. Furthermore, Sorba gave several reasonable explanations for the problems encountered on the three jobs cited by the defendants.

Unlike the plaintiffs in *Chipollini* and *Sorba*, Healy has been unable to demonstrate specific evidence "that could support an inference that the employer did not act for non-discriminatory reasons." *Chipollini, supra.* Healy has thus not presented the court with a genuine issue of material fact as to whether, "but for" his age, he would not have been discharged. *See supra* at 1214 (articulating the standard for summary judgment).

We acknowledge that this is a close case. The Company has shown that competitive pressures led to a company-wide RIF which forced a consolidation of several high-level executive positions, one of which was occupied by Healy. Within this context, the Company has presented substantial evidence that its decision to discharge Healy was for legitimate business reasons. The Company identified specific weaknesses in three of Healy's performance evaluations, cited a recent and important project where Healy performed unsatisfactorily, and proffered evidence showing that Healy's replacement was better qualified to exercise the kind of initiative, creativity, and managerial discretion required of a high level executive. Furthermore, the Company corroborated these legitimate business reasons with statistical evidence suggesting that there was no discriminatory intent by the relevant decision makers.

---

**3.** The dissent seems to suggest that the standard for summary judgment should be more stringent here because this is a case that would otherwise go to a jury. However, the standard for granting summary judgment is the same regardless of whether the case would have otherwise been tried by a judge or a jury.

On the other hand, as Healy has pointed out, up until his discharge he received reasonably favorable employment evaluations and had been promoted by the company. Moreover, there are some differences in tone between the evaluations he received while working and the *post hoc* evaluation. We are satisfied, however, that the difference between the employment evaluations is one of degree rather than of kind. The problems that the *post hoc* review identifies are the same problems that were noted by the reviewers in 1983 and 1985. Thus we do not think that the differences in the evaluations themselves create a genuine issue of material fact.

In the end, the evidence provided by Healy demonstrates only that he performed competently in his previous jobs. But the essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired. To create a factual dispute as to pretext, Healy must not only introduce evidence from which a reasonable person could infer that he is qualified; he also must introduce evidence that casts doubt on his employer's contention that there was a legitimate business justification for letting him go. We agree with the district court that Healy's efforts to contrast his qualifications vis-a-vis Russell's, given his limitations described above, are legally insufficient to cast such doubt. Barring any attempt to hide discrimination, the Company has the right to make business judgments on employee status, particularly when the decision involves subjective factors such as creativity and initiative that the Company deems essential to high-level executive positions.

The judgment of the district court will be affirmed.

SHAPIRO, District Judge, dissenting.

Plaintiff, William Joseph Healy, filed a complaint seeking relief from alleged age discrimination by his former employer in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.;* he asserted his right to the trial by jury granted by Congress in making age discrimination actionable. 29 U.S.C. 626(c)(2). Upon review of the pleadings, discovery and supplemental affidavits, the district judge determined that although questions of fact precluded a finding that plaintiff had not made a *prima facie* case, defendant had offered evidence that plaintiff's termination was based on factors other than age and plaintiff had not met his burden of producing either direct evidence of discriminatory intent or evidence from which an inference of discrimination could be drawn.

In reaching this conclusion the district judge's opinion discussed not whether sufficient evidence was produced from which a reasonable jury might infer age discrimination, *Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200 (3d Cir.1987), but whether the evidence had "substance." That is, the grant of summary judgment relied on determinations of the credibility of affiants in weighing the evidence. Because I believe that a grant of summary judgment for defendant is inconsistent with a recent *in banc* decision of the Court of Appeals, and usurps the role of the jury in age discrimination cases, I respectfully dissent from the majority opinion.

It is important in reviewing the record below to remember that this is an *age* discrimination case, *not* a case alleging discrimination based on race or sex which is tried to a court not a jury under Title VII, 42 U.S.C. § 2000e *et seq.* The ADEA expressly and deliberately created a cause of action to be tried to a jury so that issues of age discrimination would not be disposed of by federal judges. When Senator Kennedy introduced the amendment to the ADEA which provided for jury trials, he stated that it was an important addition to the legislation because,

> juries are more likely to be open to the issues which have been raised by the plaintiffs. Sometimes, a judge may be slightly callous, perhaps because he himself is protected by life tenure, or because he is somewhat removed from the usual employer-employee relationship. The Jury may be more neutral in such circumstances.

Cong.Rec. S34318 (October 19, 1977), reprinted in Legislative History of the Age Discrimination in Employment Act, at 505 (1981).

Following his termination, plaintiff filed this action alleging a violation of the ADEA. Defendant responded that it was protected by an exception to the ADEA (29 U.S.C. 623(f)(1)) as the termination of plaintiff was for a "reasonable factor other than age." At the close of discovery, defendant moved for summary judgment, on the grounds that (1) plaintiff had not made out a *prima facie* case of age discrimination and (2) plaintiff could offer no evidence to rebut defendant's assertion that his discharge was for reasonable factors other than age or that this explanation for the discharge was pretextual. The district court held that questions of fact precluded summary judgment on the ground that plaintiff had not made out a *prima facie* case; that is, plaintiff had met the burden of showing the four factors required:

... '(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was dismissed despite being qualified; and (4) he ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.' *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.1987). Drawing inferences from the record favorably to Healy, questions of fact preclude summary judgment on this point.

Letter–Opinion and Order, Lechner, J., June 25, 1987, p. 12 (A195), n. 1.

Because defendant articulated evidence of economic necessity for a reduction in force and evidence that plaintiff was less qualified than his replacement, plaintiff concededly was required to offer evidence from which a jury might reasonably infer that the reasons given for his discharge were pretextual and that age was a determinative factor in his termination.

However, the trial judge credited the affidavits submitted by defendant in support of its position, determined that the plaintiff offered no evidence of "substance" and had come forward with no "facts to demonstrate age was a factor"

in his termination, and granted summary judgment. But the proper standard does not require the plaintiff to prove his case to the satisfaction of the trial judge in order to present his claims to a jury. Plaintiff meets his burden merely by presenting evidence from which it could reasonably be inferred that he was not dismissed for the reasons articulated by the employer.

The jury need only decide whether the employer dismissed [Healy] because of reports from his supervisors.... If not, it is more likely than not that the employer based his decision on an impermissible consideration such as age.

*Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200, 205 (3d Cir.1987).

In *Sorba,* the Court of Appeals followed its recent *in banc* decision in *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir. 1987) (*in banc*). *Chipollini* stands for the proposition that to avoid summary judgment in favor of defendant in an age discrimination reduction in force case, it is not even necessary for a plaintiff to submit direct evidence of pretext to rebut defendant's claim of a legitimate reason for the discharge. Plaintiff only has to present evidence sufficient to create the inference that the reasons given for his discharge were pretextual. In other words, plaintiff must submit "evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge [that] reasonably *could* support an inference that employer did not act for non-discriminatory reasons" and not "evidence [that] *necessarily* leads to that conclusion that the employer did act for discriminatory reasons." *Id.* at 900. If an employee produces enough evidence to support an inference that the reasons given for the discharge were pretextual, the court should not grant the employer's motion for summary judgment even if it believes a jury would or should find for the defendant.

The district court found that Healy established a *prima facie* case if inferences from the record were drawn favorable to the non-moving party as the law requires. But the court also found that the company

presented "substantial evidence" to support its claim that Healy was not discharged because of his age. Letter–Opinion and Order, Lechner, J. at p. 12 (A195).

First, there was affidavit testimony of the non-discriminatory impact of the reduction in force which supposedly showed that "Healy's termination was not the product of systematic age-based discrimination on the part of the company." *Id.* at 13 (A196). Statistical evidence was offered to show that the company-wide percentage of employees over the age of 40 remained essentially the same as a result of the reduction in force. Of course, this data did not include the employees who elected early retirement. Although subject to challenge, this evidence was admissible to show lack of intent to discriminate against Healy because of his age. But Healy is claiming age discrimination against him personally; non-disparate impact is only evidentiary not conclusory. The reasons for lack of reliance on this statistical evidence in support of defendant's position that it did not use its reduction in force as a pretext for age discrimination are well stated in Section E of the majority opinion.

Second, there was affidavit testimony of two superiors, Ubl and Hinrichs, which supposedly showed that the decision to terminate Healy and give his responsibilities to Russell was based on a managerial perception that Russell was more highly qualified to handle post-reduction consolidated responsibilities; this was allegedly supported by documentary evidence (performance evaluations of Healy and Russell before and after litigation was instituted). The signed statements of Hinrichs and Ubl, prepared by them or their company's attorney after the fact, are inconsistent with contemporaneous evaluations of each employee.

The district judge then found Healy submitted no specific facts either to support the allegations of his complaint or to rebut or undermine the evidence presented by the Company in support of its motion. However, Healy could point to the following specific facts which, if credited, establish a genuine issue for trial because a rational trier of fact could find in his favor; *see Matsushita Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986):

1. The Company's 20% reduction in force supposedly in response to competitive pressures was accomplished in part by the offer of early retirement to employees 55 years or older; Healy declined to accept this option.

2. The President's letter of January 28, 1986, to all agents and employees reported a "good year for new business" and referred to impressive performance not the need for further reductions in force as might be expected. (A78).

3. Healy, age 57, enjoyed a long and successful relationship with New York Life. He was promoted regularly and seemingly routinely. By the time of his discharge, following 23 years with the Company, he had risen from the rank of Agent to that of Marketing Vice President.

4. Plaintiff's performance evaluations were consistently positive. He had received a favorable job performance evaluation as recently as March 25, 1985. (A62). This 1985 evaluation said,

> He demonstrates significant people and team-building skills. He takes direction and guidance easily and quickly. He demonstrates a genuine business concern for people. He utilizes good judgment in addressing his responsibilities. Due to the above factors, he has earned the respect and loyalty of his divisional employees.

In fact, prior to his discharge, Healy had received only scores of "A Notable Strength" and "Effective Performance".

5. Healy's last pre-termination performance review on March 25, 1985, was by John Wm. Zorio; his views are relied on by the Company to establish Healy's inability to delegate. Under the heading "Opportunities for Improvement," Zorio stated, "[h]e must delegate more of the work-load and spend more time in staff development." (A65). But under the heading "Management Skills and Abilities," his performance in delegating assignments and authority was graded as "Effective Performance."

While not listed as a "Notable Strength," neither was it categorized as "Needs Improvement." That same evaluator noted under "Attainment of Annual Objectives," that Healy's performance was characterized by "Excellent Results Achieved in *all* KRAs ("Key Result Areas"). Zorio then commented, "He has made significant contributions in *numerous* and varied task force/committee assignments. Healy's overall performance rating was, "[e]xceeds the level of performance required to fulfill the responsibilities of this position."

6. In contrast, on August 4, 1986, six months *after* Healy's termination, one month after his complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and with no apparent need for evaluation of an "outplaced" employee, Ubl prepared a "Performance Evaluation" listing satisfactory performance in three key result areas with the fourth, "Management by Objective" ("MBO") "in progress." For the first time, Healy, a terminated employee, is graded as "needs improvement in three respects, "Planning and Organizing Work," "Delegating Assignments and Authority," and "Developing Subordinates" (even though it was the younger subordinate he developed who was supposedly so effective in replacing him). Even this evaluation commented favorably on his good communication skills, knowledge and experience. Then Ubl added, "Bill too zealously guards his "turf" to the extent subordinates feel little opportunity to expand areas of responsibility. Needs to delegate more—take a bigger view of his job. Must be more future oriented—focuses on the here and now—Broaden horizon—must assume more and different responsibilities a more acquisitive view of what needs to be done as part of the job." (A82).[4]

7. Healy stated under oath that his assignment to coordinate the MBO program for the Marketing Department took no more than 10% of his time. Of course, 10% of an employee's time can be substantial if spent on an important project. But regardless of how a court might evaluate its importance, the limited time or relatively minor role, if magnified by the employer, can also be evidence of pretext.

Healy was cross-examined extensively concerning his role in preparing the MBO for 1985–86 at his deposition. The testimony cited by the majority from A125–127 certainly suggests his limited view of his role; moreover, it was a view differing from that articulated for the Company in the defense of this cause of action. The full excerpts from the Healy deposition (A118–125; A128–133) show an understanding of the MBO project that differs from that of the defendant; this sharp conflict in the testimony should be resolved by the trier of fact. Neither the majority nor the trial judge should decide that Healy's view is inherently incredible. Healy is in no different a position than Chipollini or Sorba in denying under oath these post-litigation complaints of his performance.

8. Healy was never warned he was doing a bad job and he knew he was doing a good job. (A103). Of course, managers are "not compelled to convey dissatisfaction to employees," but absence of prior complaints about performance is evidence of pretext. Others, including people in marketing, were given indications of termination and told to take the voluntary retirement offer. (A136). Healy was not.

9. Hinrichs cited only the need for reduction in force in Healy's termination interview. (R106). In Marketing, two vice presidents, Hesse (agent training) and Healy (management training) had reported to Marketing Vice President Walter Ubl who, in turn, reported to Senior Vice President Jerald Hinrichs, the head of the Marketing Department. Hinrichs stated that with Hesse's opting for early retirement, he had determined to eliminate Healy's position as

---

**4.** The majority opinion views this post-termination evaluation as not substantially different from his previous ones. It adds that Healy submitted no evidence indicating this review was aberrational or in any way pretextual. But in my opinion the lack of need for an evaluation of a terminated employee is itself evidence of pretext; the post-termination evaluation is also inconsistent with itself and in comparison with prior evaluations. Therefore, its very existence is aberrational and pretextual.

well. The alleged inadequacy in Healy's performance, like the alleged superiority of his replacement, Paul Russell, was discovered only after this litigation commenced.

10. The April 15, 1985 Performance Review of Paul Russell, who assumed most of Healy's work responsibilities following his discharge, suggests more reason for concern regarding professional capabilities than Healy's evaluation that same year. (A71). Russell received a grade of "Needs Improvement" in the area of written communications. In the comment section of the evaluation, Zorio stated that, "[h]e needs improvement in written communication area." (A73). The position to which Russell was recommended for promotion by Ubl on July 1, 1986 requires "frequent ... written contact" with company personnel, field management and vendors. (A150).

It was not until approval of the September 1, 1986 promotion recommendation of Russell that his abilities merited recognition at the Grade 18 level, a Grade level Healy had attained as early as July 1, 1984. (A55).

Healy does not have to prove he was more qualified than Russell to survive a motion for summary judgment; he need only produce evidence that the company's supposed judgment at the time of termination that "Russell was more highly qualified to handle the post-reduction consolidated responsibilities" (A198) was pretext. In view of Healy's good performance in management training and prior experience in agent training, compared to Russell's lack of dual experience, Healy has succeeded in meeting his burden on this record.

11. Delay in combining the positions of Marketing Vice President for Management Training and Marketing Vice President for Agent Training from February until July, as explained by Hinrichs in his affidavit in support of the summary judgment motion suggests doubts as to his conviction of the ability of Russell at the time of Healy's termination and reflects on the credibility of the substance of the other averments therein. (A138).

12. Healy did not adequately respond to the statistical evidence proffered by the company, but it was not his burden to do so. Healy alleges disparate treatment not disparate impact. As correctly stated by the majority, the statistics are of relevance to the defense. But whether or not the statistics suggest Hinrichs and Ubl did not terminate Healy because of his age is irrelevant to whether Healy has proffered evidence from which a rational fact-finder could determine that they did.

It is not necessary to consider and weigh the evidence offered by the company because that is the proper function of the finder of fact; on this record, there are issues of material fact for resolution by the proper factfinder. Notwithstanding the Company's proffered explanation that Healy was terminated because of a non-discriminatory reduction in force and his inadequate performance, Healy's evidence would permit a jury reasonably to find that his age was a determining factor in the decision to terminate him and replace him with a younger employee, and that but for his age he would not have been terminated. *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

> Under the ADEA, the ultimate burden remains with the plaintiff to prove that age was a determinative factor in the defendant employer's decision. *See, e.g. Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). The plaintiff need not prove that age was the employer's sole or exclusive consideration, but must prove that age made a difference in the decision.... [P]laintiff's ultimate burden of persuasion includes the requirement to show that the defendant's proffered reason is a pretext for discrimination, *i.e.,* that the proffered reason is merely a fabricated justification for discriminatory conduct. *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095.... The plaintiff may meet this burden 'either directly by persuading the court that a discriminatory reason more likely motivated the

employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.'* *Id.* at 256, 101 S.Ct. at 1095 (emphasis added). *Chipollini,* 814 F.2d at 897, 898.

The Supreme Court of the United States has indicated that it is error to require direct evidence of discriminatory intent. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 717, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983).... This is true in part because age discrimination, like other forms of discrimination, is often subtle.... Thus, by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment. *Chipollini,* 814 F.2d at 898, 899.

In the context of the summary judgment motion, however, the court should have considered whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably *could* support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence *necessarily* leads to that conclusion that the employer did act for discriminatory reasons.... *Chipollini,* 814 F.2d at 900 (emphasis supplied).

The *Chipollini* case has been quoted from so extensively because this case is distinguishable from it only by the identities of the parties. There the *in banc* court reversed the district court's grant of summary judgment because, as in this case, the district court erred in weighing competing inferences itself and in resolving disputed facts. Chipollini was informed at the time that his termination was due to a cutback in expenses; his duties and title were later assumed by a younger man who had been promoted to his assistant on Chi-

pollini's recommendation. This happened to Healy. Chipollini had performed his duties in a satisfactory manner and received pay increases and bonuses every year except the last year. This is essentially the record of Healy. In answer to the litigation, the employer asserted Chipollini was terminated not only because of a reduction in force but because of his deficient attitude regarding certain special projects. This is, in every material matter, the script for Healy's employer. The plaintiff in *Chipollini* contradicted the defendant's position on his performance of duties and denied defendant's description of his responsibilities as an "energy warden" by affidavit; Healy did much the same in regard to management post-litigation complaints about his inadequate performance regarding an MBO assignment.[5] Healy's assertion that the MBO was only 10% of his duties must be accepted for purposes of this motion.

Chipollini merely denied the existence of a medical problem supposedly affecting his work performance by affidavit; he proffered no independent medical evidence. Healy asserted his belief in his fine performance and his experience; this was supported by all his performance evaluations prior to termination and the consequent litigation. It was only six months after termination and the month following Healy's EEOC complaint that the problems with Healy's performance were first articulated. In attempting to distinguish *Chipollini,* the majority, at p. 1220, properly accepts all such averments of plaintiff Chipollini and all inferences therefrom as "fact." If the same were done for Healy, the grant of summary judgment for defendant could not be affirmed.

As in *Chipollini,* "[t]he plaintiff challenges the defendant's post-litigation articulation of its intent and the documentary evidence can be viewed as supporting the

---

**5.** While based on personal familiarity with Management by Objective programs rather than facts of record, Healy's account of his activities in preparing the marketing MBO plan is more consistent with MBO theory and practice than the Ubl and Hinrichs complaints suggest; at the least their statements concerning Healy's sup-

posed deficiencies in this project could have been tested at trial. The conflict in views of the nature of the project and Healy's performance creates an issue of fact. Instead, the company's affidavit rather than Healy's has been accepted in reviewing this motion for summary judgment.

plaintiff's challenge. Consequently, the issue of pretext turns on [defendant's] credibility and is not appropriate for resolution on a summary judgment motion. The plaintiff is entitled to a jury trial on the merits. *See* 29 U.S.C. § 626(c)(2) (1982)." *Chipollini*, 814 F.2d at 901.

In *Sorba*, the other summary judgment age discrimination case recently decided by the Court of Appeals, a 54 year old employee was discharged after 27 years of employment. The company claimed that Sorba had performed poorly on his last three jobs, that he had padded jobs, accrued unnecessary overtime expenses, caused morale problems and refused to obey direct orders. The district court granted summary judgment for the employer based on a finding that the employer had articulated valid and non-discriminatory reasons for the discharge, and that Sorba's factual allegations did not present a triable issue of fact.

Sorba admitted that his last three jobs were not successes from the perspective of the company, but claimed that the poor results were due to factors beyond his control. Additionally, there was testimony that Sorba did not cause morale problems and that one of his supervisors knew of no instance when he had unnecessarily extended work. Based on this contradictory evidence, the Court of Appeals held that granting summary judgment was reversible error.

Similarly, Healy has produced evidence by deposition, documents and affidavits which, if credited by the jury, could support an inference of pretext. The presentation of conflicting evidence means that a jury should be given the opportunity to assess the credibility of the employer with respect to the proffered reasons for the discharge. Instead, the majority analyzes the evidence, makes credibility determinations and decides the case in favor of defendant; summary judgment is not a substitute for trial by jury even in an age discrimination reduction in force case.

The majority correctly states, "[t]he difficult issue in the case is whether Healy sufficiently demonstrated that a genuine issue of material fact existed concerning the company's asserted non-discriminatory reasons for Healy's discharge." In deciding this issue, the majority opinion recites matters of record developed through depositions, affidavits and company documents and refers to moving defendant's self-serving proffers, unchallenged by cross-examination at trial, as "facts." This is so only if the proper fact-finder was the district judge and/or the appellate panel.

Congress expressly intended that age discrimination charges be resolved by juries rather than federal judges; it wanted allegations of age discrimination determined by juries in order to ensure that the rights of plaintiffs would be fully protected. In view of this unequivocably expressed congressional intent, a court should not take age discrimination issues from the jury except in the clearest case. This is not such a case; it is a close case and plaintiff is entitled to have it tried to a jury.

Of course, the standard for summary judgment is the same whether a case would have otherwise been tried by a judge or a jury. But that standard as enunciated by the Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) has been met here. In *Celotex*, the Supreme Court held that summary judgment is appropriate where the non-moving party has not adequately set forth and defended the elements of the *prima facie* case. *Celotex* does not require that same level of proof when the non-moving party has made out a *prima facie* case but must rebut the showing of the defendant. Similarly, *Anderson* requires only that in evaluating the strength of a *prima facie* case, the same standard be applied as would ultimately be applied by the jury. This case also governs only the sufficiency of the *prima facie* case. Neither *Celotex* nor *Anderson* gives a judge the authority to assess the strength of evidence or the credibility of witnesses' affidavits once the *prima facie* case has been adequately established.

Here the issue is not whether Healy has established a *prima facie* case; that is conceded. The issue is whether Healy has offered evidence from which a jury might reasonably infer that the reasons for his discharge articulated in response to this *prima facie* case were pretextual. This is the issue on which the legislative history finds that "juries are more likely to be open." This is more not less true where a reduction in force or reorganization is utilized to terminate older workers and difficult issues of pretext are presented.

Where Congress has expressly found "a jury may be more neutral" than a judge, we should not be concerned that every charge of age discrimination arising out of a reduction in force will require a jury trial. We should be concerned that any corporation with an economic incentive for age discrimination will be able to mask it by arranging for a temporary reduction in force and/or reorganization with the assurance that if a charge of age discrimination is made, it can be tried to a court by self-serving post-litigation affidavits of "fact." We should be concerned that our decision places a burden on the older victim of discrimination unintended by Congress, the burden to convince a court he or she will prevail before allowing a jury to decide.

If, as the majority believes, Healy's allegations of age discrimination are unfounded and age was not a substantial factor in his termination, a jury should and would decide against him. For the foregoing reasons, I respectfully dissent and would reverse the judgment of the district court and remand for a trial by jury.